AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
10/24/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ASI_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
10/24/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ts_____ DEPUTY

United States of America

v.

MARIBEL ROCIO CASTANEDA PALOMINOS,

Defendant.

Case No. 2:24-mj-06488-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about October 22, 2024, in the county of Los Angeles, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii) | Possession with Intent to Distribute Cocaine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*
☒ Continued on the attached sheet.

/s/ Geovanni Cuevas
_____
Complainant's signature

Geovanni Cuevas -- Special Agent, HSI
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: October 24, 2024

_____
Judge's signature

City and state: Los Angeles, California

Hon. Stephanie S. Christensen U.S. Magistrate Judge
_____
Printed name and title

AUSA: Lisa Lindhorst (x6772)

**AFFIDAVIT**

I, Geovanni Cuevas, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Maribel Rocio CASTANEDA Palominos ("CASTANEDA") for violating 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute.

2. This affidavit is also made in support of an application for a warrant to search the following two cellphones (collectively, "SUBJECT DEVICES"), currently in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, each of which are described more fully in attachment A: (1) a grey iPhone seized from CASTANEDA's personal belongings ("DEVICE-1") and (2) a foldable silver Samsung Galaxy cellphone seized from CASTANEDA's personal belongings ("DEVICE-2").

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute controlled substances), 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), and 18 U.S.C. § 554 (knowing exportation of any merchandise contrary to any law) (the "Subject Offenses"), as described more

fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been since January 2024. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. In the course of my work, I have conducted physical surveillance, executed search warrants, and reviewed electronic records.

6. I have a bachelor's degree in Homeland Security from American Military University. I was a Security Forces Officer in the United States Air Force for approximately four years. During that time, I worked as patrol officer, field training officer, armorer, and response force leader. I have completed approximately 500 hours of instruction from the Federal Law

Enforcement Training Center, resulting in a certificate of completion from the Criminal Investigator Training Program ("CITP"). I have also completed approximately 500 hours of HSI related instruction from the Federal Law Enforcement Training Center, resulting in a certificate of completion from the Homeland Security Investigations Special Agent Training program.

### III. SUMMARY OF PROBABLE CAUSE

7. On October 22, 2024, CASTANEDA checked two overweight suitcases filled with approximately 25 kilograms of suspected cocaine onto her international flight scheduled to depart San Jose and land in Sydney, Australia. As discussed below, the flight had a layover at the Los Angeles International Airport ("LAX"). Due to her recent travel pattern of making the same flight with overweight bags, and as part of an effort to combat drug smuggling to Australia, airport security officers were surveilling her from the moment she arrived at San Jose Airport.

8. The drugs were searched during her layover at LAX pursuant to international border search authority. A K-9 alerted to the bags as they passed through a bag reroute room and when officers searched the suitcases, they found 24 bricks of a compressed white substance that yielded presumptively positive results for Cocaine hydrochloride. The total wight of the powder with packaging was approximately 25 kilograms. After CASTANEDA was intercepted at her gate and asked about the bags, she admitted to owning both suitcases, she had the bag tags and overweight baggage receipt on her, and her clothing was inside

the suitcases alongside the suspected narcotics. She also had in her possession DEVICES 1 and 2.

### IV.   STATEMENT OF PROBABLE CAUSE

Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following.

**A.   CASTENADA Checks Two Overweight Suitcases Filled with Suspected Narcotics onto her Flight to Australia**

9.   In the afternoon of October 22, 2024, HSI special agents were surveilling San Jose International Airport on suspicion that CASTENADA may be trying to smuggle narcotics to Australia, based on her recent flight patterns. She had previously done the same flight several times, most recently in August 2024.  Her flight on October 22, 2024, was scheduled to depart San Jose at 6:22 p.m. and arrive in Sydney, Australia the following day – with a three-hour layover at LAX.

10.   Agents saw CASTENADA arrive at the San Jose airport at 4:37 p.m. She was sitting in the back seat of a vehicle, and she then retrieved two rolling suitcases from the trunk, consistent with the suitcases later found to contain suspected cocaine.

11.   Agents continued watching as she walked to the Delta international check in counter to check into Delta flight 3656. The agents stood close by and heard the Delta agent tell CASTENADA that both of her suitcases were slightly over the 50-lb. weight limit: one was 58 lbs., the other was 56 lbs.  The

4

Delta agent suggested that CASTANEDA lighten or redistribute the contents just slightly to avoid hundreds of dollars in overage fees. CASTANEDA declined and agreed to pay the double overweight bag fee without any efforts to redistribute the bags' weight.

12.  After checking in her suitcases, CASTANEDA walked through security and ultimately boarded the flight.  Agents viewed and photographed her bags as the bags were being loaded onto the flight, as shown below:




13.  Agents did not inspect the at San Jose Airport and instead alerted officers at LAX to the impending arrival of CASTENADA's bags, which would be subject to border search authority at LAX before being loaded onto the international flight.

5

**B. Officers at LAX Search CASTENADA's Suitcases Pursuant to Border Search Authority and Find 25 Kgs of Suspected Cocaine**

14. At 7:30 p.m. on October 22, 2024, CASTENADA landed in LAX for a three-hour layover. She was scheduled to next depart LAX on Delta Flight 41 and land in Sydney, Australia the following day.

15. Before her bags were routed onto the second leg of this international journey, they went through a "bag reroute" room in which Customs and Border Protection ("CBP") officers and K-9 units screen for hazardous materials or contraband, including narcotics. This screening protocol is pursuant to CBP's international flight screening protocols and border search authority, which are in part designed to curb current narcotics smuggling trends from the United States to Australia.

16. In the reroute room, a K-9 alerted to CASTANEDA's checked luggage, indicating the potential presence of contraband. CBP officers then pulled both suitcases for inspection. The officers unzipped both suitcases and immediately saw black "Hefty" brand storage bags underneath which they could feel what appeared to be bricks of pressed powder in vacuum sealed bags.



### C. CASTANEDA Admits to Owning Both Suitcases filed with Suspected Cocaine and in Fact Retrieves Personal Items from One of the Suitcases

17. After the K-9 alert and the discovery of this suspicious packaging, officers intercepted CASTENADA at her gate as she was trying to board the next flight to Australia and brought her to the inspection area with all her personal belongings.

18. While at the inspection area, CASTANEDA confirmed that she owned both suitcases. She also had in her possession the bag tags that matched both suitcases and the $200 excess baggage receipt:

19. Officers then continued their search of both suitcases with CASTENADA present. Inside the suitcases, next to the hefty bags, officers found clothing that appeared to match the size,

7

gender, and appearance of CASTANEDA. Additionally, CASTANEDA said while sitting there that she was cold and so asked (and was given permission to) retrieve a sweater from one of the suitcases.

    20.   Beneath the hefty storage bags in both suitcases, officers found large black plastic vacuum sealed bricks:




    21.   After cutting open each vacuum-sealed bag, officers recovered from inside them a total of 24 smaller bricks of compressed white powder wrapped in multicolored plastic wrap:



8

22. Based on my training and experience investigating narcotics cases, I recognize the white powder substance depicted in the photographs above as cocaine.  Officers also presumptively tested one of these smaller bricks and it yielded positive results for Cocaine Hydrochloride.

23. According to the officers that weighed and presumptively tested the bricks, the combined total of the 24 plastic-wrapped bricks found in CASTEANADA's suitcases, inclusive of the packaging, amounted to approximately 25 kilograms.

**D. CASTENADA Possessed Both SUBJECT DEVICES**

24. After being escorted to the bag screening area, Officers seized from CASTENADA's personal possession both SUBJECT DEVICES. Specifically, she had DEVICE-1 in her pocket and DEVICE-2 inside her personal carry-on belongings.  She admitted both devices were hers.  Officers seized the devices, which are currently in HSI's possession.

25. After all of the above events, agents attempted to interview CASTENADA but before doing so read CASTENADA her Miranda Rights. She invoked and declined to speak further without a lawyer.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

26. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of

meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[1] As used herein, the term "digital device" includes SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

e. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

f. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

g. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

29. For all of the reasons described above, I submit that there is probable cause to believe that CASTANEDA committed a violation of 21 U.S.C. §§ 841(a)(1); Possession with intent to distribute Cocaine. I further submit that there is probable cause to believe that the items to be seized described in

13

Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 24 th day of October 2024.

_____
HON. STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE